FILED

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS** 2011 FEB 15  PM 3: 16
**AUSTIN DIVISION**

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | **CRIMINAL NO.**_____ |
| ) | |
| **Plaintiff,** ) | **I N D I C T M E N T** |
| ) | |
| ) | **USAO #2010R00077** |
| **v.** ) | |
| ) | [Violations: |
| ) | 18 U.S.C. § 1349, 371 and 1956- Conspiracy |
| **KURT BRANHAM BARTON,** ) | 18 U.S.C. § 1343– Wire Fraud; |
| ) | 18 U.S.C. § 1014- False Statement/Loan; |
| **Defendant.** ) | 15 U.S.C. § 77q(a) & 77x- Securities Fraud; |
| ) | 18 U.S.C. § 1956 and1957-- |
| ) | Money Laundering] |

**THE GRAND JURY CHARGES:**

A11CR 083 LY

## Introduction

## Triton Finanical

1.     Triton Financial, L.L.C., was a Texas Limited Liability Company, formed in or about September of 2002 (hereinafter referred to as Triton Financial).  Beginning in or about June of 2006, Triton Financial's primary place of business was located at 7035 Bee Caves Road in Austin Texas in an office named "Triton Plaza."  In or about December of 2007, Triton Financial's primary place of business moved to 12117 Bee Caves Road, Suite 100, Austin, Texas in an office named "Triton Center."

2.     Triton Financial was primarily owned by the Defendant,

# Kurt Branham Barton

(hereinafter referred to as the Defendant or Barton). Initially, the Defendant served as Triton Financial's President, Chairman, Chief Executive Officer and sole director.  Any reference to "Triton" means both Triton Financial and all of its various subsidiaries.

3.      In or about 2005, the Defendant enlisted the aid and abilities of John Joseph DiMeglio (hereinafter referred to as DiMeglio) in the operations of Triton.  At various times, DiMeglio held himself out publicly as the Chief Financial Officer and Executive Vice President of Triton Financial. In addition, DiMeglio acquired an ownership interest in Triton Financial.

4.      In or about June of 2006, the Defendant registered with the Texas State Securities Board as an investment advisor representative of Triton Financial.  Registration as an investment advisor, allowed the Defendant and Triton employees to offer certain investment opportunities to the public.

## The Triton Partnerships

5.      Since at least 2004, Triton Financial sponsored dozens of investment opportunities and raised over $50 million for these various ventures and limited partnerships.  These investments, ventures and limited partnerships were often centered on the purchase of a single asset.

6.      In a typical investment proposal, the Defendant and Triton would create a limited partnership or limited liability company (hereinafter referred to as a "limited partnership," L.P. or L.L.C.) to support the purchase of an asset, typically a piece of real estate, a commercial property or other asset.  Investors received a pro rata share of ownership, based on the dollar amount of their investment.

7.      Each limited partnership was controlled or managed by a general partner or holding company.  All general partners were owned by Triton Financial.  As a consequence, all general partners were controlled by the Defendant.  Individual investors in a limited partnership had no control over the operations and financial management of the partnership. Instead, the investors were dependent upon the good faith, honesty and abilities of the Defendant.

8.    The Defendant maintained bank accounts at Compass Bank in Austin, Texas for Triton Financial and all of the Triton affiliates.  The Defendant also maintained an account styled Kurt B. and Suzanne Barton at Compass Bank in Austin, Texas.  Any reference to a Triton affiliated account or personal account of the Defendant refers to the accounts maintained at Compass Bank in Austin, Texas.

# The Raises

9.    Triton used an internal sales staff and sponsored broker-dealers to contact potential investors in the various ventures and partnerships.  Triton also used prominent former National Football League players and Heisman Trophy winners to solicit and encourage additional investors. In exchange for invested funds, investors received promissory notes, security instruments and/or shares in a limited partnership.  Throughout this indictment, investors are identified by their initials rather than their full names.

10.    The collective funds received from investors related to a particular investment proposal were commonly referred to as a "raise."  In the case of real estate investments, the investment opportunity was marketed to claim that the piece of property would be acquired lien-free with the "raise" proceeds, i.e. investors were told that the partnership in which they invested would own the property free and clear of any encumbrances. If Triton actually purchased an asset on behalf of the raise, the limited partnership would take actual ownership and title to the purchased property.

# The Scheme

11.     From in or about December of 2005 and continuing until December of 2009, the exact dates of which are unknown, Defendant Kurt Branham Barton devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises. The scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, so devised and so intended, was, in substance, as described in the following paragraphs.

12.     The object and purpose of the scheme was to fraudulently acquire cash and assets so as to:

    a.    prop up failing Triton partnerships and other Triton investments;

    b.    make payments or fund distributions to investors so as to lull the investors into the mistaken belief that their investment remained sound;

    c.    personally enrich the Defendant and DiMeglio;

    d.    support an expanding Ponzi scheme;

13.     It was part of the scheme that Triton fraudulently acquired cash and assets from individual investors from across the United States.

14.     It was part of the scheme that the Defendant transmitted or caused others, including investors and those working on behalf of the Defendant and Triton, to transmit by wire communications in interstate commerce, writings, signs, signals, pictures and sounds to and from the Austin, Texas area to locations outside the State of Texas. These wire communications include but are not limited to wire communications in the form of:

    a.    telephone calls;

    b.    email communications via the Internet;

    c.    electronic communications involving the clearing of checks and other deposits through the Federal Reserve banking system.

    d.    the transfer of investor funds from financial institutions and investment

companies located outside of the state of Texas to financial institutions in the Western District of Texas.

15.     It was part of the scheme that the Defendant represented that the investors and clients of Triton were a priority.  For example, on the Triton website (www.tritonfinancial.com) the Defendant boasted that

> "From day one , I've made it our business to put the needs of our clients first, creating a compelling Wall Street alternative for all investors.  At Triton, our goal is simple: We want to help you reach your personal financial goals.  That means being a place where your money works hard.  And where you can get the guidance and support you need - whatever type of investor you are."
> 
>     - Kurt Barton
>     Founder, President & CEO of Triton Financial

16.     It was part of the scheme that the Defendant represented to investors that the investors could trust the Defendant and Triton because of the Defendant's virtue and integrity.  For example, on the Triton website, the Defendant emphasized that:

> We are committed to our integrity
> Triton expects the highest levels of personal conduct by all its employees, whatever their position. It is acknowledged that all effective business relationships, inside as well as outside Triton, depend on honesty, integrity and fairness.  A Triton employee...
> *  respects the rule of law and abides by all applicable laws and regulations...

17.     It was part of the scheme that the Defendant represented that Triton was purchasing properties, businesses and other assets with the funds obtained from individual investors when in truth and in fact the investors' funds were also used to satisfy the needs of other ventures and the need to pay quarterly dividends or redemptions to prior investors.

18.     It was part of the scheme that accurate cash-flow and accounting information was withheld from investors, as well as, the internal and external sales staff and other Triton employees.

19.     It was part of the scheme that the Defendant boasted of a successful investment

strategy and investment plan that allowed him to guarantee positive returns when in truth and in fact Triton's financial situation continued to deteriorate over time.

20.     It was part of the scheme that investors were lulled into the mistaken belief that their investment had applied in the manner that had been promised by the Defendant and Triton.

21.     It was part of the scheme that the Defendant and DiMeglio fraudulently sought and acquired loans from private commercial lenders and financial institutions.  Specifically, the Defendant and DiMeglio provided false and fraudulent documentation related to their assets, liabilities, investments and net worth.

22.     It was part of the scheme that investor funds were withdrawn without proper authorization from investor investment accounts (typically investor accounts with Fidelity Brokerage Services, L.L.C.) by fraudulently placing the investor's signature on withdrawal requests.

23.     It was part of the scheme that the Defendant and DiMeglio created false, fictitious and fraudulent limited partnerships, including but not limited to Eastern Star, L.P., Naples Vista, L.P., CVA, L.P. and Heries, L.P.  These partnerships were sometimes referred to as entities that received "bridge loans." These partnerships would ostensibly borrow money from Capvest, L.L.C. and in exchange provide a note and security agreement to Capvest.  In reality, these partnerships had no assets or value and never borrowed money from Capvest. Instead, the worthless security agreements provided by the partnerships and Capvest were designed to lull Capvest investors into the continued belief that their investment was secure.

24.     It was part of the scheme that through the use of different raises, the creation of different partnerships and the opening of Compass bank accounts for each investment, the Defendant created the illusion of separate and distinct Triton investments and Triton assets when in truth and

in fact, the Defendant commingled the funds of different investments.

    25.   It was part of the scheme that the Defendant misrepresented certain facts and circumstances to potential investors and current clients including but not limited to the following specific misrepresentations:

(a)    that previous partnerships were solvent or operating at a profit when in truth and fact most of the partnerships were not operating at a profit nor were solvent, absent the unlawful siphoning of funds from other partnerships;

(b)    that Triton would take no money out of a limited partnership or other venture until the underlying asset had been sold. Only when the underlying asset was sold would Triton receive a fee or reimbursement for expenses;

(c)    that the Defendant had his "own money in the deals" and was otherwise invested in the Triton limited partnerships;

(d)    that investor funds would be used in a specific manner and for a specific purpose;

(e)    that the properties purchased by the limited partnerships would be "cash only" deals and the properties would be owned "free and clear;"

(f)    that some partnership properties would be purchased with funds generated from the raise when in truth and in fact the properties would be purchased by securing loans;

(g)    the purported multi-million dollar net worths of the Defendant and DiMeglio were false and fraudulently inflated;

(h)    that the Defendant claimed to be a graduate of, and hold a degree from, Colorado State University, when in truth and in fact he did not graduate from Colorado State University nor earn a degree;

(i)    that the Defendant claimed to have sold an ownership interest in an insurance company, for anywhere between $15 to $40 million in the late 1990s when in truth and in fact the Defendant did not do so.

26.     It was part of the scheme that the Defendant omitted and failed to disclose material facts to potential investors and current clients, including but not limited to the following, that:

(a)     investor funds had been, and would be, funneled and diverted to other partnerships;

(b)     investor funds had been, and would be, used for purposes unrelated to the specific venture in which the investor had been solicited and invested;

(c)     partnerships were operating at a loss, were insolvent and/or were dependent upon the siphoning of funds from other partnerships;

(d)     after funds generated from a raise were used to purchase the partnership property or asset free and clear of any encumbrances, the purchased asset was used as collateral on a subsequent loan. The proceeds of that loan were then used for purposes unrelated to the initial raise, investment or partnership;

(e)     the Defendant and DiMeglio were seeking loans from commercial lenders and financial institutions by submitting false and fraudulent statements related to their personal wealth;

(f)     the Defendant made use of false and fraudulent E*Trade statements that grossly inflated his worth;

(g)     the Defendant took withdrawals from Triton bank accounts to fund personal expenditures.

27.     In 2009, the Texas State Securities Board and the U.S. Securities and Exchange Commission began to examine Triton's business operations. Investigators requested documents and information from Triton.  In response to these requests, the Defendant provided altered and fabricated documents.  These fraudulent submissions were designed to mislead regulators and conceal the on-going fraud scheme.

# Overt Acts

In furtherance of the conspiracy and in order to effect the purpose and objects of the conspiracy, the Defendant engaged in numerous overt acts. Those overt acts include but are not limited to the following specific acts:

28.     In or about December of 2005 the Defendant advised potential investor, T.D., of an investment opportunity (Georgian Warehouse). The Defendant stated that if T.D. contributed $700,000, the Defendant would put in $50,000 "of his own money" so as to purchase the Georgian Warehouse for a total of $750,000. Instead, the property was purchased for approximately $515,000 and the Defendant never contributed any funds towards the purchase of the property.

29.     From in or about December of 2006 to February of 2009, the Defendant repeatedly instructed a Triton employee to fabricate the Defendant's E*Trade monthly account statement so as to dramatically increase his apparent investment holdings. For example, on or about January 29, 2009 the Defendant produced a fraudulent E*Trade statement reflecting a balance of $3,161,170.00 when the actual balance in the account at that time was $3,161.17.

30.     From in or about January of 2007 to March of 2009, the Defendant repeatedly presented fabricated and fictitious versions of his E*Trade monthly account statement to financial institutions, commercial lenders and potential investors.

31.     From in or about May of 2009 to November of 2009, the Defendant repeatedly submitted, or caused to be submitted, withdrawal requests to Fidelity Brokerage Services, L.L.C. related to investor accounts. These withdrawal requests were submitted to Fidelity without the permission of the individual investors. The withdrawn funds were wire transferred and deposited to a Triton related bank account.

32.    On or about April 15, 2008, the Defendant and John Joseph DiMeglio created a fictitious "Grant of Lien" in the name of "CVA, L.P., a New York limited partnership," to serve as security on a loan made to Capvest by S.A. and N.A.

33.    In or about May of 2008, the Defendant represented to D.G. that he could provide her a 15-20% return on her investment, that her investment would be safe in his company and that her investment would last her for the rest of her life. D.G. invested $830,423.29 of proceeds from a life insurance policy received after her husband died. Upon receipt, the Defendant used approximately $750,000 of D.G.'s money to pay off a loan.

34.    On or about September 24, 2008, the Defendant provided a falsified "Purchase and Sale Agreement" reflecting the sale of Triton Golf, L.P.'s purported interest in a golf course to S.A. and N.A. Triton Golf never owned an interest in a golf course.

35.    On January 29, 2009, the Defendant provided investor B.Y. with a falsified E*Trade account statement.

36.    On October 21, 2009, the Defendant sent an email communication to J.G. concerning the status of her bridge loan to "Heries" in which the Defendant stated:

> They are working on some title issues that showed up on the properties title report. Some old issues that were resolved but were not taken off the title report. As soon as those are resolved it should close and fund. They said it will take them until next week to finish.

In truth and in fact, the Defendant never applied J.G.'s investment towards a loan to "Heries."

37.    On or about October 21, 2009 the Defendant sent an email communication to S.E.Y.K. to explain to her why a $100,000 check drawn on a Capvest account and made payable to her would not clear her bank. The Defendant stated, "We are working with the bank to resolve the

bounced check." In truth, the Defendant had placed a stop-payment on the check on October 19, 2009 because the account had insufficient funds to cover the check.

38.     In or about October of 2009, the Defendant instructed a Triton employee to fraudulently recreate previously signed investor promissory notes altering portions that described the purpose of the note/loan and the security for the loan. These fabricated promissory notes were then presented by the Defendant or another at his direction to the Texas State Securities Board.

39.     On December 18, 2009, the Defendant sent a text message to D.A. in which the Defendant stated "Yes the bridge funds have collateral" when in truth and in fact the bridge funds had no true collateral.

## COUNT ONE
### [18 U.S.C. §§ 371, 1349 and 1956(h)]
### Conspiracy

The Grand Jury re-alleges and incorporates the Introduction, Scheme and Overt Acts

(numbered paragraphs 1-39) of this Indictment as if fully set forth herein.

From in or about December of 2005 and continuing until in or about December of 2009,

in the Western District of Texas and elsewhere, the Defendant,

### KURT BRANHAM BARTON,

did knowingly and willfully combine, conspire, confederate and agree with another individual:

(a)     to **Provide False Statements in Relation to the Acquisition of Loans**, that is, in connection with the loans obtained from financial institutions described in this Indictment, did knowingly make false statements for the purpose of convincing the financial institution to release funds pursuant to the aforementioned loan, namely the Defendant provided false and fraudulent documentation and misrepresentations associated with the application and underwriting of the loans;   All in violation of Title 18, United States Code, § 1014 and § 371.

(b)     to commit **Wire Fraud**, that is, to knowingly devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises and for the purpose of executing such scheme and artifice to defraud and attempting to do so, the Defendant did transmit or cause to be transmitted by wire communications in interstate commerce, writings, signs, signals, pictures and sounds;  in violation of Title 18, United States Code § 1343 and § 1349.

(c)     to commit **Money Laundering**, that is, to knowingly conduct and attempt to conduct financial transactions knowing that the property involved in said transactions represents the proceeds of some form of unlawful activity and said property did in fact involve the proceeds of specified unlawful activities, namely:  Title 18, United States Code § 1343 and § 1014:  (a)  with the intent to promote the carrying on of a specified unlawful activity; and (b) knowing the transactions are designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of said specified unlawful activity; in violation of Title 18, United States Code §§ 1956(a)(1)(B)(i) and (A)(i) and § 1956(h).

All in violation of Title 18, United States Code Sections 371, 1349 and 1956(h).

## COUNT TWO
### [15 U.S.C. §§ 77q(a) and 77x]
### Securities Fraud

The Grand Jury re-alleges and incorporates the Introduction, Scheme and Overt Acts (numbered paragraphs 1-39) of this Indictment as if fully set forth herein.

From in or about December of 2005 and continuing until December of 2009, in the Western District of Texas and elsewhere, the Defendant,

### KURT BRANHAM BARTON,

knowingly and willfully, in connection with the offer and sale of securities, by the use of transportation and communication in interstate commerce, directly and indirectly:

    (a)    employed the previously described scheme and artifice to defraud;

    (b)    obtained money by means of untrue statements of material facts and omission of material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading;

    (c)    engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers, namely: investors who purchased securities.

All in violation of Title 15, United States Code §§ 77q(a) and 77x.

## COUNTS THREE through SEVENTEEN
### [18 U.S.C. § 1343]
### Wire Fraud

The Grand Jury re-alleges and incorporates the Introduction, Scheme and Overt Acts (numbered paragraphs 1-39) of this Indictment, as if fully set forth herein.

From in or about December of 2005 and continuing until in or about December of 2009, in the Western District of Texas and elsewhere, the Defendant,

### KURT BRANHAM BARTON,

knowingly devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, did transmit or cause to be transmitted by wire communications in interstate commerce, writings, signs, signals, pictures and sounds for the purpose of executing such scheme and artifice to defraud (The Wires).

The Wires include but are not limited to the wires described specifically below:

| COUNT | DATE | The Wires |
|---|---|---|
| 3 | March 18, 2008 | a check in the amount of **$1,000,000** drawn on the GE Interest Trust account of S.A. and N.A.maintained by Sky Bank in Indianapolis, Indiana and deposited to the Triton Golf account. Sky Bank clears its checks through the Federal Reserve system via wire communication. |
| 4 | May 23, 2008 | a wire transfer of approximately **$830,423.29** from the account of D.G. with MetLife Investors USA Insurance Company account (via Bank of America in New York) to the Capvest account. |
| 5 | August 19, 2008 | wire transfers totaling approximately **$170,900** from the Fidelity account of L.S. in New York to the account of Triton Acquisition dba Triton Insurance. <br> a. $ 63,300 <br> b. $ 18,600 <br> c. $ 89,000 |
| 6 | October 31, 2008 | a wire transfer of approximately **$1,460,000** from an account controlled by S.A. and N.A. at Morgan Stanley & Co., Inc. (via Citibank in New York) to the Triton Bridge Fund account. |

| COUNT | DATE | The Wires |
|---|---|---|
| 7 | January 30, 2009 | wire transfers totaling approximately **$400,000** from B.Y. controlled accounts with Charles Schwab (via Wells Fargo Bank in California) to the account of Triton Acquisition dba Triton Insurance.<br>a. $125,000<br>b. $100,000<br>c. $25,000<br>d. $25,000<br>e. $25,000<br>f. $25,000<br>g. $25,000<br>h. $25,000<br>i. $25,000 |
| 8 | March 3, 2009 | a wire transfer of approximately **$150,000** from the account of S.C. at Morgan Stanley & Co., Inc. (via Citibank in New York) to the Capvest account. |
| 9 | March 6, 2009 | a wire transfer of approximately **$500,000** from the Fidelity account of J.R.G. and R.P.G., Trustees for the G****** Trust in New York to the Capvest account. |
| 10 | April 3, 2009 | a wire transfer of approximately **$350,000** from the account of A.J.F. or C.N.F. at Chase Bank in Arizona to the Triton Financial account. |
| 11 | June 26, 2009 | a wire transfer of approximately **$582,000** from the Fidelity account of D.R.A. and E.A. in New York to the 8227 Broadway, L.P. account. |
| 12 | July 14, 2009 | a wire transfer of approximately **$1,025,000** from the Fidelity account of D.R.A. and E.A. in New York to the 8227 Broadway, L.P. account. |
| 13 | August 20, 2009 | a wire transfer of approximately **$225,000** from the Charles Schwab account of A.F.C. and L.E.C. (via Wells Fargo Bank in California) to the 8227 Broadway L.P. account. |
| 14 | October 1, 2009 | a wire transfer of approximately **$400,000** from the Fidelity account of A.W.P. in New York to the Triton Aggregated, L.P. account. |
| 15 | October 27, 2009 | a wire transfer of approximately **$150,000** from the Fidelity account of A.W.P. in New York to the Triton Aggregated, L.P. account. |
| 16 | November 18, 2009 | a wire transfer of approximately **$50,000** from the Fidelity account of A.W.P. in New York to the Triton Aggregated, L.P. account. |

15

| COUNT | DATE | The Wires |
|-------|------|-----------|
| 17 | November 20, 2009 | a wire transfer of approximately **$205,000** from the Fidelity account of A.W.P. in New York to the Triton Aggregated, L.P. account. |

All in violation of Title 18, United States Code Section 1343.

## COUNTS EIGHTEEN through TWENTY-TWO
### [18 U.S.C. § 1014]
### False Statement Related to a Loan

The Grand Jury re-alleges and incorporates the Introduction, Scheme and Overt Acts (numbered paragraphs 1-39) of this Indictment, as if fully set forth herein.

From in or about December of 2005 and continuing until in or about December of 2009, in the Western District of Texas and elsewhere, the Defendant,

### KURT BRANHAM BARTON,

in connection with the loans obtained from the following financial institutions, did knowingly make false statements for the purpose of convincing the financial institution to release funds pursuant to a requested loan, namely the Defendant provided false and fraudulent documentation and misrepresentations associated with the application and underwriting of the loans.

The false statements include but are not limited to the false statements made to the following financial institutions and described specifically below:

| COUNT | DATE | Financial Institution | False Statements |
|-------|------|----------------------|------------------|
| 18 | January 18, 2007 | Sterling Bank | in connection with a $500,000 line of credit (which was later increased to **$1,000,000**) for Triton Auto, L.P., the Defendant claimed that he owned approximately $4.9 million in assets the majority of which was held in an E*Trade account when in truth and in fact he did not. |
| 19 | April 25, 2008 | Wells Fargo Bank | in connection with a loan of approximately **$4,480,000** to 8121 Bee Cave, L.P. d/b/a Triton Center L.P., the Defendant claimed that he owned over $6.2 million in assets and marketable securities when in truth and in fact he did not. |
| 20 | July 23, 2008 | Independent Bank | in connection with a loan of approximately **$1,450,000** to Triton Plaza, L.P., the Defendant claimed that he owned approximately $6,250,000 in stocks and bonds in an E*Trade account when in truth and in fact he did not. |

| 21 | September 3, 2008 | EverBank | in connection with a loan of approximately **$1,800,000** to Grant Villa Apartments, L.P., the Defendant claimed that he owned approximately $6,250,000 in stocks and bonds in an E*Trade account when in truth and in fact he did not. |
| 22 | October 6, 2009 | Southwest Securities, F.S.B. | in connection with a loan of approximately **$1,640,000** for the purpose of refinancing a loan and the corresponding debt and associated liens by Grant Villa Apartments, L.P, the Defendant claimed to own $1,560,000 in securities when in truth and fact the Defendant did not. |

All in violation of Title 18, United States Code Section 1014.

## COUNTS TWENTY-THREE through THIRTY-THREE
### [18 U.S.C. §§ 1956(a)(1)(B)(i) and (A)(i)]
### Money Laundering- Promote and Conceal

The Grand Jury re-alleges and incorporates the Introduction, Scheme and Overt Acts (numbered paragraphs 1-39) of this Indictment, as if fully set forth herein.

From in or about December of 2005 and continuing until in or about December of 2009, in the Western District of Texas and elsewhere, the Defendant,

### KURT BRANHAM BARTON,

aided and abetted by another, did conduct and attempt to conduct the following financial transactions knowing that the property involved in said transactions represents the proceeds of some form of unlawful activity and said property did in fact involve the proceeds of specified unlawful activities, namely the offenses described in Counts Three through Twenty-Two of this Indictment, namely: Title 18, United States Code § 1343 and § 1014:

(a)     with the intent to promote the carrying on of a specified unlawful activity;and

(b)     knowing the transactions are designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of said specified unlawful activity.

The transactions include but are not limited to the transactions described specifically below:

| COUNT | DATE | FINANCIAL TRANSACTION |
|---|---|---|
| 23 | May 23, 2008 | a wire transfer of approximately **$750,000** from the Capvest account to the Easy Lending Solutions L.L.C. account at Independent Bank in Austin, Texas to repay a short term loan made by Easy Lending Solutions to Triton. |
| 24 | August 20, 2008 | a wire transfer of approximately **$107,674.46** from the Triton Athletic Center account to Independence Title Company for the benefit of C.W. |
| 25 | March 4, 2009 | a wire transfer of approximately **$600,000** from the Triton Financial account in Austin, Texas to the account of Axis Capital, Inc at Capital One Bank in Nebraska. |

| COUNT | DATE | FINANCIAL TRANSACTION |
|-------|------|----------------------|
| 26 | March 9, 2009 | a financial transaction involving the transfer of approximately **$300,000** from Capvest account to Triton Financial account and then the Triton Athletic Center account and then to the account of Valla Construction at Sterling Bank in Texas. |
| 27 | April 6, 2009 | a wire transfer of approximately **$300,000** from the Triton Athletic Center account to the account of R.F. at Wells Fargo Bank in Austin, Texas. These funds were used to reimburse R.F. for a home equity loan he had taken out to cover Texas Athletic Center expenses. |
| 28 | June 26, 2009 | two transfers of approximately **$500,000** from the 8227 Broadway L.P. account to the Triton Financial account:<br>a. June 26, 2009- $300,000<br>b. June 26, 2009- $200,000<br>These funds were later used to support a variety of Triton expenses unrelated to Triton Athletic Center II. |
| 29 | July 14, 2009 | a wire transfer of approximately **$341,780.27** from the 8227 Broadway L.P. account to Gracy Title to support a variety of Triton expenses unrelated to Triton Athletic Center II. |
| 30 | July 14, 2009 | a transfer of approximately **$650,000** from the 8227 Broadway L.P. account to the Triton Financial account. These funds were later used to support a variety of Triton expenses unrelated to Triton Athletic Center II. |
| 31 | August 20, 2009 | a wire transfer of approximately **$112,500** from the Capvest account to the account of B.J.M. at FirstBank of Wheat Ridge in Colorado. |
| 32 | October 27, 2009 | a transfer of approximately **$100,000** from the Triton Financial account to the Capvest account. These funds were used to cover a $100,000 check written to a previous investor. |
| 33 | November 20, 2009 | a transfer of approximately **$106,000** from the Triton Financial account to the Capvest account. These funds were used to cover a $106,000 check written to a previous investor. |

All in violation of Title 18, United States Code Sections 1956(a)(1)(B)(i) and (A)(i) and 18 United States Code Section 2.

## COUNTS THIRTY-FOUR through THIRTY-EIGHT
## [18 U.S.C. §§ 1957 and 2]
## Money Laundering– >$10,000

The Grand Jury re-alleges and incorporates the Introduction, Scheme and Overt Acts (numbered paragraphs 1-39) of this Indictment, as if fully set forth herein.

From in or about December of 2005 and continuing until in or about December of 2009, in the Western District of Texas and elsewhere, the Defendant,

### KURT BRANHAM BARTON,

aided and abetted by another, knowingly engaged in a monetary transaction of criminally derived property of a value greater than $10,000 which had been derived from specified unlawful activity in and affecting interstate commerce, that is, the specified unlawful activities more specifically described in Counts Three through Twenty-Two of this Indictment, namely: violations of Title 18, United States Code § 1343. The monetary transactions include but are not limited to the transactions described specifically below:

| COUNT | DATE | MONETARY TRANSACTION |
|---|---|---|
| 34 | March 24, 2008 | a wire transfer of approximately **$150,000** from the Triton Financial account at Compass Bank in Austin, Texas to the account of Sentient Jets, Inc. at Bank of America in Massachusetts. |
| 35 | March 25, 2008 | a check in the amount of **$21,138.03**, drawn on the account of Kurt B. and Suzanne Barton, deposited to the Lone Star BMW/Triumph Motorcycles in Austin, Texas account at ABC Bank to fund the purchase of a motorcycle. |
| 36 | October 17, 2008 | a check in the amount of **$250,000,** drawn on the account of Kurt B. and Suzanne Barton and made payable to the University of Texas for the purchase of a sky box at DKR-Texas Memorial Stadium. |

| COUNT | DATE | MONETARY TRANSACTION |
|-------|------|----------------------|
| 37 | November 3, 2008 | a check in the amount of **$41,257.22**, drawn on the account of Kurt B. and Suzanne Barton, deposited to the Jaguar Land Rover Audi Fort Meyers account at Wachovia Bank to fund the down payment on the purchase of an Audi automobile. |
| 38 | August 20, 2009 | a transfer of approximately **$15,000** from the Triton Financial account to the account of Kurt B. and Suzanne Barton. |
| 39 | October 1, 2009 | a transfer of approximately **$20,000** from the Triton Financial account to the account of Kurt B. and Suzanne Barton which was used in part to fund a check made payable to Gray and Becker, a law firm. |

All in violation of Title 18, United States Code Sections 1957 and 2.

ORIGINAL SIGNATURE
REDACTED PURSUANT TO
E-GOVERNMENT ACT OF 2002

JOHN E. MURPHY
UNITED STATES ATTORNEY


By: _____
Mark Lane
Assistant United States Attorney