## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

|  |  |  |
|---|---|---|
| | § | |
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | |
| | § | **CRIMINAL NO. A-11-CR-83 SS** |
| **KURT BARTON** | § | |
| | § | |
| | § | |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

**TO THE HONORABLE SAM SPARKS, UNITED STATES DISTRICT JUDGE FOR THE WESTERN DISTRICT OF TEXAS:**

The Defendant, Kurt Barton ("Mr. Barton"), through his attorneys, Rip Collins and David Gonzalez, files the following Memorandum in Aid of Sentencing[1].

## I.
## QUESTIONS PRESENTED

1.  When Congress enacted the Sentencing Guidelines, it focused upon the unfair way in which federal sentencing failed to treat similar offenders similarly. Ever after *United States v. Booker,* the advisory nature of the Guidelines still serves to preserve uniformity in sentencing because a Guideline range sentence is presumed to be a reasonable sentence. However, there appears to be absolute chaos in determining the sentences for defendants in multimillion dollar fraud cases. Some district courts impose a Guidelines

---

[1] In recent years many of the high profile defendants convicted of multimillion dollar fraud offenses spent hundreds of thousands of dollars in legal fees researching and writing about the exact same issue before the Court today. For reasons of frugality, efficiency, and advocacy, court appointed counsel cites heavily from other federal defendants' elaborate sentencing memorandums.  Rather than cite every line of every argument, counsel refers the Court to the Sentencing Memorandum written in *U.S. v. Dreie*r, 1:09-CR-00085 (S.D.N.Y. 2009) as both the template and source of substantive content for this Memorandum. *Appendix A* and arguments regarding the history of the 2B1.1 enhancements can be found at the Federal Public Defender's website at http://www.fd.org/pdf_lib/James%20Client%20--%20Fraud%20Sentencing%20Memo%20--%204.12.11.pdf

range sentence. Most impose a sentence significantly less than the Guidelines advise.[2]

Should the Court impose a Guideline range sentence to avoid unwarranted sentence disparities under 18 U.S.C. 3553(a)(6) because that is what all the other federal district courts *should* be doing in order to avoid future sentencing disparities based on similarly situated defendants, or should the Court impose a non-guidelines range sentence because that is what most federal district courts *are* doing and would avoid a current sentencing disparity for this similarly situated Defendant?

2. Does Kurt Barton deserve to die in prison when his business partner and fifty percent owner in the company – who was reviled by everybody in the company, was clearly involved in many instances of fraud, and as Chief Financial Officer would have known that Triton was using investor money for operating expenses - will serve no more than five years?

3. Should the life Kurt Barton lived prior to his involvement with Triton Financial demonstrate that he has the capacity to have a meaningful life after prison?

**II.**
**RESOLVING THE GUIDELINE CALCULATIONS**
**SO THAT THEY MAY STILL BE "ADVISORY"**

The current proposed scoring of the advisory Guidelines for Mr. Barton is calculated at Level 55.

The sentencing table – which has been carefully crafted, meticulously drafted, and painstakingly researched – only reaches Level 43.  Based upon Mr. Barton's advisory Guideline range, is this such strong "advice" from the Guidelines that the Court has no other option for imposing a reasonable sentence other than life in prison?

---

[2] *See Exhibit A – Chart of White Collar Multi Million Dollar Fraud Defendants*

In many cases, sentencing courts faced with the severe §2B1.1(b)(1) enhancements appear to simply disregard the Guidelines and instead move directly to a consideration of the 18 U.S.C. § 3553(a) factors.   Mr. Barton contends that the Guidelines can still be instructive if appropriately adjusted. Three distinctions in the interpretation and application of §2B1.1 can simultaneously make the Guidelines meaningful and advisory.

**A.    The Enhancement Provisions Should Be Distinguished Between Fraud and Theft.**

The proposed offense Level of 55 is driven almost entirely by the 24 level adjustment for the loss amount under Section 2B1.1(b)(1)(M).   While a progressive sanction based upon loss or gain amount is rational, a slope of the escalating enhancements so steep that it renders the rest of the Guidelines meaningless is not.   In the previously filed objections to the Presentence Report, counsel suggested using the amount of money Mr. Barton personally gained from the endeavor to determine the enhancement under 2B1.1(b)(1). Regardless of which dollar amount is used – actual loss or actual gain — Mr. Barton faces the single greatest enhancement contained within the guidelines. *See Exhibit B – Enhancement Chart*. This single provision overwhelms the other enhancements under 2B1.1 specifically designed to provide more serious punishment for more serious types of fraudulent behaviors.

If the provisions under 2B1.1 can be distinguished between theft versus fraud adjustments, the Guidelines can retain their purpose of preventing unwarranted sentencing disparities. When a defendant is accused of theft or embezzlement, it is rational sense to have a steep slope for the enhancement levels based upon the loss

amount: this is the only way to provide adequate deterrence to prevent a defendant from simply running a cost-benefit analysis and deciding that it makes just as much sense to steal $20 million as it does $100,000. Because most of the other enhancements under 2B1.1 would not apply in a simple theft or embezzlement scenario, the Guidelines would provide meaningful advice in determining a sentencing range.

However, fraud cases are far more complicated. Rarely, if ever, is there a defined amount of money that serves as an easily ascertained loss amount like in an embezzlement or theft case. The Guidelines punish fraud – and conspiracies – more severely because of their capacity to spin out of control and cause far greater harm than originally thought possible. To this extent, the myriad sentencing enhancements under 2B1.1 and the adjustments under Chapter Three provide for meaningful advice in determining a sentencing range. While the amount of money involved should be a factor, it should not be the *overwhelming* factor.

The adjustments to offense level for antitrust crimes provide a good example of how this interpretation is already present in the Guidelines. If a defendant is convicted of price-fixing, U.S.S.G. §2R1.1 provides a high base offense level of 12. Compared with the base offense level of 6 or 7 under §2B1.1, it is fair to assume that the base offense level for antitrust offenses already takes into account such factors like sophisticated means, multiple victims, and volume of commerce up to $1,000,000. The adjustments to offense level under §2R1.1 *begin* at $1,000,000 and climb – on a gradual slope - to $1.5 billion. If a defendant was liable for every enhancement applicable under §2R1.1, the highest offense level he would be facing is Level 29.

Under the proposed application of the sentencing enhancements under §2B1.1 to Mr. Barton, he scores at a Level 43.  Mr. Barton's top-of-the-chart score only occurs when you meld these two scenarios – fraud and theft - which creates a sentencing irregularity that U.S.S.G. §3D1.2(c) (Groups of Closely Related Counts) is designed to prevent.

**B.  The Amount of Money in Question Should Be Distinguished Between "Volume of Commerce" and "Actual Loss."**

Mr. Barton advocates that the gain that resulted from the offense should be used as the measure of loss because the loss reasonably cannot be determined. Should this objection be overruled, Mr. Barton further argues that the government's proposed figure of $75,466,599 as an actual loss (e.g. the reasonably foreseeable pecuniary harm that resulted from the offense) is actually more similar to the volume of commerce than an actual loss.

U.S.S.G. §2R1.1 is instructive as to how there is a distinction between these two terms for purposes of providing a sufficient, but not greater than necessary, sentence for large scale financial crimes. Quite simply, the Commission concedes that the main purpose of §2R1.1 is to provide deterrence without having to engage in complex loss calculations which would likely result in endless litigation. The Commentary to §2R1.1 explains:

> Tying the offense level to the scale or scope of the offense is important in order to ensure that the sanction is in fact punitive and that there is an incentive to desist from a violation once it has begun.  The offense levels are not based directly on the damage caused or profit made by the defendant because damages are difficult and time consuming to establish.

The volume of commerce is an acceptable and more readily measurable substitute. The limited empirical data available as to pre-guidelines practice showed that fines increased with the volume of commerce and the term of imprisonment probably did as well.

The Commission believes that the volume of commerce is liable to be an understated measure of seriousness in some bid-rigging cases. For this reason, and consistent with pre-guidelines practice, the Commission has specified a 1-level increase for bid-rigging.

Substantial fines are an essential part of the sentence. . . Because the Department of Justice has a well-established amnesty program for organizations that self-report antitrust offenses, no lower minimum multiplier is needed as an incentive for self-reporting. A minimum multiplier of at least 0.75 ensures that fines imposed in antitrust cases will exceed the average monopoly overcharge.

U.S.S.G. §2R1.1.

This interpretation supports the distinction between punishing theft and fraud differently. Furthermore, it provides a lens to understand how and why other courts may reject the government's proposed guidelines calculations and yet still issue a Guideline range sentence without relying solely upon a downward departure. *See United States v. Adelson*, 441 F.Supp. 2d 506, 512 (S.D.N.Y. 2006), aff'd, 301 Fed. Appx. 93 at **1 (2d Cir. Dec. 9, 2008) (describing "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense."); *see also United States v. Parris*, 573 F.Supp.2d 744, 745 (E.D.N.Y. 2008) (describing "the Sentencing Guidelines for white collar crimes" as "a black stain on common sense" while

sentencing defendant to a term of incarceration of 60 months in the face of an advisory guidelines range of 360 to life).

### C. The Guidelines Distinguish Between Base Offense Level and the Adjustment to Offense Level Enhancement

The Guidelines take into account the seriousness of an underlying offense by setting a base offense level. Likewise, the Guidelines take into account the seriousness of a particular aggravating factor by applying a corresponding enhancement. When reviewing the Guidelines for other economic offenses in U.S.S.G. §2B, the overall trend is that the adjustments to the offense level do not eclipse the base offense level.

The base offense level for burglary of a residence pursuant to U.S.S.G. §2B2.1 is 17. Similar to the value ladder used for antitrust offenses, the loss amount adjustments provide a very gradual slope. If a dangerous weapon was possessed, the offense increases only 2 levels.

The base offense level for robbery pursuant to §2B3.1 is 20. Similar to the value ladder used for antitrust offenses, the loss amount adjustments provide a very gradual slope. Both the use of a firearm and whether a victim sustained bodily injury allow for further enhancements, but not to exceed 11 levels.

The base offense level for fraud pursuant to §2B1.1 is 7. Unlike the other serious offenses, the proposed adjustment to Mr. Barton's sentence (24 levels) is four times of the base offense level (7) for theft.  This is a 400% increase for this one factor. This disproportionate enhancement creates a disparity where the volume of commerce may be extremely high while the direct benefit to the defendant may be extremely low. This is the same scenario for burglary and robbery: the risk of harm created by the offense

justifies a high base level because the amount of money actually recovered is irrelevant. Similarly, if Mr. Barton was responsible for managing a company that resulted in many more millions of dollars of losses than he either intended or directly benefited from, it stands to reason that his conduct – not just the dollar amount in question – should dictate the most pertinent sentencing factors.

Finally, even though the Commission implemented this enhancement ladder in the Guidelines, the Court retains the power to calculate the advisory Guidelines in the manner that reduces sentencing disparities. *See United States v. Cavera*, 550 F.3d 180, 192 n.9 (2d Cir. 2008) (citing *Kimbrough v. United States*, 552 U.S. 85 (2007). Similarly, in addressing the crack/powder cocaine Guideline disparity in *Kimbrough*, the Supreme Court held that it would not be an abuse of discretion for a district court to disregard the crack cocaine guidelines in order to avoid sentencing disparities that might result.

For an overwhelming majority of cases, the Guidelines provide for consistency and uniformity in sentencing. While defendants with the same criminal history may be treated differently based upon their individual circumstances, the Guidelines provide a bookend of predictable ranges of sentences. There is little debate amongst district courts on how to calculate the base offense level or enhancements for robbery or burglary. However, this is one of the rare situations where there is significant disagreement amongst the district courts. When some district courts follow a strict application of the Guidelines in §2B1.1 and many more depart significantly, a sentencing disparity is likely to result – no matter which method the Court employs.

However, if the Court solely uses the base offense level for fraud and the single enhancement for actual loss or gain – a more proportionate and meaningful Guideline range results. Alternatively, if the court uses the base offense level for fraud – and all other enhancements except the amount of loss – a more proportionate and meaningful Guideline range results. When these two methods overlap and the cumulative total is added without any regard for duplicity, an off-the-chart Guideline range results.

### III.
### APPLICATION OF THE 18 U.S.C. 3553(a)(1) FACTORS: NATURE AND CIRCUMSTANCES OF THE OFFENSE AND CHARACTERISTICS OF THE DEFENDANT

**A.     Nature and Circumstances of the Offense**

As the Court aptly summarized in its Order denying the Defendant's Motion for new Trial, the nature and circumstances of the offense involved obtaining money from investors that never went to the purpose of the investment. The breakdown of deposits from investors with the immediate withdrawal and expenditures on behalf of Triton Financial – and not the purported investment– was easily tracked by the clear trail of bank deposits, withdrawals, and accounting entries.

In his summation to the jury, Mr. Collins offered a backhanded defense of Mr. Barton's actions as "delusional." How else could one explain how millions of dollars went into the business but not directly into Mr. Barton's wallet? Why else would he hire competent people like Mike Vint, Jerri Rice, Caleb Cunningham – and give them unrestricted access to all of Triton's financial records? Why did he try so hard to save the

business instead of simply admitting that he didn't have millions of dollars saved away, that he overpromised returns to investors, and that he was way in over his head?

We submit that the evidence at trial demonstrated that Mr. Barton believed – perhaps irrationally – that he could undo the earlier mistakes he had made. While he overcompensated himself, his monumental mistake was in taking on a substantial amount of overhead that the cash flow of the business model could not support. Triton should not have spent $70,000.00 for sophisticated accounting software. Triton should not have sponsored a golf tournament. Triton should not have hired as many people, leased expensive commercial real estate, or continued to try and attract new clients until it solved its most fundamental problem: cash flow.

Mr. Barton – like so many business leaders in the dot.com era – believed he could fix a profitability problem with a rapid growth solution. Using internal companies like CapVest, Mr. Barton used investor money as working capital – not as actual investments. So long as the business continued its rapid growth and expansion – and real estate prices continued to head into the stratosphere – cash flow, investment dollars, and profits could become unethically and illegally comingled because, as they erroneously believed, profits were a given and could be easily extracted and untangled later. Like any business that confuses gross revenue with profit, market share with income, and growth with cash flow - this was an unsustainable endeavor.  Just as investors in Wall Street lost billions during the dot.com era, the investors in Triton have similarly lost everything.  The difference, the government contends, is that the investors in Triton did not have a chance to adequately assess their risks.

While the government contends that Mr. Barton never intended to run a legitimate business, there are simply too many good people – like David Tuckfield, Richard Finlayson, Ty Detmer, and Chris Weinke – who believed otherwise.  As this Court noted, "[t]here was never any defense to Mr. Barton's conduct other than perhaps in his own mind." (Order on Motion for New Trial at 3.) The simplicity of the government's evidence comes from Triton's own banking records and numerous cash withdrawals and deposits. While there were several instances of falsified records, it was the exception and not the rule. Mr. Barton hired bright people who were unafraid to speak truth to power, and unfortunately, he did not listen.

He did, however, hire them in the first place. This leads to the quixotic thought process that illustrates that the nature and circumstances of the offense has less to do with Mr. Barton's greed and more about his pride. Mr. Barton could have hired nothing but Yes Men – and yet he chose independent thinkers who publicly challenged him and left his business. Mr. Barton could have taken the millions of dollars in loans and fled the country on a private plane – and yet he forged his E*Trade statements so that he could put money back into Triton Financial. Most importantly, Mr. Barton could have stopped everything, fired all employees, and returned as much as he could to investors. But like a gambler at a Las Vegas card table, he foolishly believed he could win it all back with one good hand.

The private plane, the sports car, the motorcycle – none of these were about greed as much as they were simple means of Mr. Barton affirming to himself that he had value; that he had achieved as much success as the people who trusted him with their money. Far more money was spent on employees and Triton operations that to increase Mr.

Barton's personal wealth. Mr. Barton was supposed to put his investors first. The evidence presented at trial illustrates that he put his business first – even before his marriage, his children, and himself.

**B.**      **History and Characteristics of the Defendant.**

Most of Kurt Barton's life differs greatly from his worst mistakes. Attached as *Exhibit C* is a compendium of character letters from Mr. Barton's family and close personal friends. Attached as *Exhibit D* is a collection of family photographs. We submit that these letters provide a far richer life history than what could be summarized.

Most people cannot comprehend that Kurt was capable of this type of fraud; it is completely out of character. We submit that these letters most accurately describe the type of person that Mr. Barton truly is: a hard worker, an Eagle Scout, and an entrepreneur. We further submit that because Mr. Barton has been held in such high esteem – for so long and by so many people – he found it very difficult to admit failure. Again, it was Mr. Barton's pride – not his greed – that might best account for Triton's collapse. While neither of these Deadly Sins helps put money back into the pockets of investors, we submit that a prison sentence can cure pride more quickly than greed.

**IV.**
**APPLICATION OF THE 18 U.S.C. 3553(a)(2) FACTORS:**
**PUNISHMENT, DETERRENCE, & PUBLIC SAFETY**

In imposing a sentence sufficient to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense, we submit that any

- 12 -

prison sentence over a decade achieves these goals. However, a sentence of life imprisonment is greater than necessary.

First, the public will be adequately protected from any further crimes of Mr. Barton. In addition to the loss of any and every investment license available, the publicity of this offense renders is impossible for Mr. Barton to ever engage in this type of business again.

Second, Mr. Barton will enter and leave prison with nothing – no job, no bank account, and no potential for future employment. While most men in their 40s and 50s are at the height of their capacity to earn an income, Mr. Barton will spend the rest of his life in a low income job. Everything he owned was seized by the Receiver. Every intangible asset he possesses – his sales ability, his integrity, his credibility – no longer exists. He will go to prison, he will forever be in debt, and his fall from grace has already been well documented by the national media.

Finally, the main concern for deterrence is  to send the message that white collar defendants will not escape prison. "Considerable evidence [suggests] that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *See Adelson*, 441 F.Supp.2d at 514 (citing, among other sources, United States Sentencing Commission, Fifteen Years of Guidelines Sentencing: As Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform, 56 (2004), for the proposition "that the Sentencing Guidelines were written, in part, to 'ensure a short but definite period of confinement for a larger proportion of these 'white collar' cases, both to ensure proportionate punishment and to achieve deterrence.'") (emphasis in original); *see also* Peter J. Henning, White Collar Crime

Sentences After Booker: Was the Sentencing of Bernie Ebbers Too Harsh?, 37 McGeorge L. Rev. 757, 781 (2006) ("One significant goal of the Sentencing Guidelines was to create a system in which white collar offenders received 'short but definite periods of confinement' and moving away from sentences that did not include at least some term of imprisonment. They were largely successful in that regard . . ." (quoting Justice Stephen Breyer, The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest, 17 Hofstra L.Rev. 1, 22 (1988), where then-Judge Breyer stated that "the Commission believed that a short but definite period of confinement might deter future [white collar] crime more effectively than sentences with no confinement condition."). No evidence suggests that there is any more deterrence for a forty-year sentence than a ten to twenty year sentence.

**V.**
**APPLICATION OF THE 18 U.S.C. 3553(a)(3) FACTORS:**
**KINDS OF SENTENCES AVAILABLE**

Many of the victims in this case have the financial resources to absorb their investment losses. Many do not.

For those victims who are aware that as taxpayers, they will continue to support Kurt Barton while he is in prison, we propose that the Court utilize all kinds of sentences available. Specifically, the Court should impose a sentence of lifetime supervised release upon Mr. Barton's completion of confinement. Not only would this provide an adequate deterrent for any future crimes, it would also provide a mechanism to maintain a restitution account for the remainder of Mr. Barton's life. While he will likely never be in

a position to earn enough money to repay all the victims, he must spend the rest of his life trying.

## VI.
## APPLICATION OF THE 18 U.S.C. 3553(4) FACTOR:
## THE SENTENCING RANGE ESTABLISHED FOR THE APPLICABLE
## CATEGORY OF OFFENSE COMMITTED

After *United States v. Booker*, 543 U.S. 220, 226-227 (2005), district courts are no longer required to impose Guidelines-range sentences. Rather, "Booker rendered the Guidelines 'effectively advisory,' and permitted sentencing courts to tailor the appropriate punishment to each offense in light of other concerns. *Id*. at 245. However, even after *Booker*, the Guidelines still "provide the 'starting point and initial benchmark' for sentencing." *Gall v. United States*, 552 U.S. 38 (2007); *Pepper v. United States*, 562 U.S. ___ (2011).

In this case, and for almost every complex white collar case, a problem arises: it is impossible for a sentencing court to use the Guidelines as a meaningful starting point when the Guidelines flatly advise a sentence of life based almost entirely on the loss chart in §2B1.1(b)(1). *See Parris*, 53 F.Supp. 2d at 751 ("it is difficult for a sentencing judge to place much stock in a guidelines range that does not provide realistic guidance."). The Supreme Court's post-*Booker* decisions make clear that a district court may in appropriate cases impose a non-Guidelines sentence based on a disagreement with the Commission's views. *See Kimbrough* at 109-110; *see also Pepper* at 23. ("That is particularly true where, as here, the Commission's views rest on wholly unconvincing policy rationales not reflected in the sentencing statutes Congress enacted.")

# VII.
## APPLICATION OF THE 18 U.S.C. 3553(a)(5) FACTOR:
## PERTINENT POLICY STATEMENTS BY THE SENTENCING COMMISSION

The United States Sentencing Commission released its Notice of Proposed

Priorities for 2012. Proposed Priority Number 2 is on Securities Fraud, Fraud Relating to

Financial Institutions, and Mortgage Fraud:

> (2) Continuation of its work on implementation of the directives in section 1079A of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111B203, regarding securities fraud offenses and fraud offenses relating to financial institutions or federally related mortgage loans; and implementation of any other crime legislation enacted during the 111th or 112th Congress warranting a Commission response.

The deadline for comments on the Commission's Proposed Priorities recently ended, and

Federal Public and Community Defenders have encouraged the Commission to resolve

the §2B1.1 Guidelines that are "rapidly becoming a mess"[3]:

> No amendments increasing penalties are necessary in response to the Dodd-Frank directives because no evidence shows that the fraud guidelines produce sentences that are too low to satisfy the purposes of sentencing. "[S]ince *Booker*, virtually every judge faced with a top-level corporate fraud defendant in a very large fraud has concluded that sentences called for by the Guidelines were too high."[4] On top of the quickly escalating loss table, in any given case there are a multitude of cumulative enhancements for many closely related factors, which easily drive the guideline range to what a "rational jurist would consider to be a draconian sentence."[5] With enhancements for multiple victims (§2B1.1(b)(2)), sophisticated means (§2B1.1(b)(9)), organizers and supervisors (§3B1.1), effect on a financial institution (§2B1.1(b)(14)(B)), and obstruction (§3C1.1), among others, fraud offenders are assured of a severe penalty under the guidelines, and no additional enhancements in response to the Dodd-Frank directives are appropriate or necessary.

---

[3] Alan Ellis, John r. Steer and Mark H. Allenbaugh, At a "Loss" for Justice: Federal Sentencing for Economic Offenses, 25-WTR Crim. Just. 34, 34-3 (Winter 2011).

[4] Frank O. Bowman III, Sentencing High-Loss Corporate Insider Frauds After *Booker*, 20 Fed. Set'g Rep. 167, 169 (Feb. 2008).

[5] *Parris*, 573 F.Supp. 2d at 750-51; *see also Adelson*, F. Supp. 2d at 510.

These enhancements are not only evidence that the guideline is more than sufficiently punitive, but also support the need for a comprehensive review of the guidelines. They replicate or overlap with each other and the concept of loss. The guideline has become the epitome of "factor creep," where "more and more adjustments are added and it is increasingly difficult to ensure that the interactions among them, and their cumulative effect, properly track offense seriousness."[6]

Perhaps even more critically, comprehensive review is necessary to reconsider the "undue weight" the guidelines afford to the loss amount.[7] "'Loss' simply needs to be given less weight."[8] It does not "adequately account for extrinsic factors such as market conditions . . . or the scienter of the offender."[9] It treats a defendant who steals "to finance a lavish lifestyle the same as one who steals the same amount to pay for an operation for a sick child."[10] And because loss is a poor indicator of culpability, the guideline that puts loss at its center inevitably creates unwarranted disparity by treating different offenders the same.

Marjorie Meyers, Public Comment on USSC Notice of Proposed Priorities for Amendment Cycle Ending May 1, 2012, August 26, 2001, available at http://www.fd.org/pdf_lib/Defender%20Priorites%20Comments%202011-2012%20corrected%20for%20posting.pdf (citations contained in original).

Ms. Meyers' letter hardly constitutes a pertinent policy statement issued by the Sentencing Commission. However, it does illustrate that this matter is more likely to be addressed by the Commission in the near future, and that the Commission may adopt theses opinions of law professors, district court judges and practitioners in reforming the application of §2B1.1.

---

[6] Fifteen Years of Guideline Sentencing at 137 (citing Barry Ruback and Johnathan Wroblewski, The Federal Sentencing Guidelines: Psychological and Policy Reasons for Simplification, 7 Psych. Pub. Pol'y & L. 739, 742 (2001).

[7] United States v. Emmenegger, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004) ("The Guidelines place undue weight on the amount of loss involved in the fraud" which in many cases is "kind of an accident," and, accordingly, is "a relatively weak indicator of the moral seriousness of the offense or the need for deterrence.").

[8] Ellis, supra note 2, at 35.

[9] Id.

[10] United States v. Ranum, 353 F. Supp. 2d 984 (E.D. Wis. 2005).

## VIII.
## APPLICATION OF THE 18. U.S.C. 3553(a)(6) FACTOR:
## UNWARRENTED SENTENCE DISPARITIES

A just legal system seeks not only to treat different cases differently but also to treat like cases alike. *Pepper* at 1254-55 (Breyer, J., concurring). The central distinction used to differentiate Mr. Barton's role from John DiMeglio's role was that Mr. Barton dealt with investors and Mr. DiMeglio did not. However, there are far more similarities from the evidence presented at trial than differences:

| Factor | Kurt Barton | John DiMeglio |
|---|---|---|
| Owner | Yes – 50% | Yes – 50% |
| Received financial distributions and owner's draws from Triton | Yes | Yes |
| Received benefit of investors' money | Yes | Yes |
| Would have known that properties were not being sold and thus, not generating cash flow | Yes | Yes |
| Knew of and used false E*Trade statements to obtain loans for the business | Yes | Yes |
| Knew of and used false promissory notes | Yes | Yes |
| Given personal knowledge of the fraud, received financial distributions that would constitute money laundering | Yes | Yes |
| Hid financial facts from other employees, specifically, that the E*Trade figures were false | Yes | Yes |

However, there are also a number of important differences:

| Factor | Kurt Barton | John DiMeglio |
|---|---|---|
| Whose primary role was Chief Financial Officer? | | John DiMeglio |
| Who spent the most time with Triton's financial records, bank account balances, and cash flow? | | John DiMeglio |
| Who advised Kurt Barton on Triton's finances? | | John DiMeglio |
| Who held himself out as having accounting expertise? | | John DiMeglio |
| Who was responsible for tax and regulatory compliance for financial matters? | | John DiMeglio |
| Who was ultimately in charge of overseeing the accounting distributions for the majority of Triton's existence? | | John DiMeglio |
| Who met with the watchmaker John Urban in Houston, stayed at his ranch, and then invented the false entity of Hermies, L.P.? | | John DiMeglio |
| Who had a previously successful and untarnished career in the insurance business? | Kurt Barton | |
| Who had a previous career in flipping distressed real estate? | | John DiMeglio |
| Who did every employee at Triton seem to viscerally distrust from their initial encounter? | | John DiMeglio |

While Kurt Barton's was painted as the mastermind of the fraud, it is ironic that

John DiMeglio similarly received significant financial benefits from Triton, but he has

quietly and successfully escaped the limelight. Mr. Barton presented the false notes to the SEC – not Mr. DiMeglio. Mr. Barton's E*Trade accounts were altered – not Mr. DiMeglio's. Mr. Barton brought attention to himself with purchases of sports cars and private airplane rentals – not Mr. DiMeglio. All the evidence suggests that Mr. Barton is a most unsophisticated criminal mastermind: he had his secretaries manufacture promissory notes, thereby creating witnesses to federal crimes that he easily could have prevented; he instructed his secretary to cut and paste numbers on a bank account statement and then let her keep the originals; he boasted about his personal wealth and profits from the sale of an insurance company instead of simply keeping his personal finances to himself.

John DiMeglio would not trust a secretary to shred the false E*Trade statements, nor would he use his own bank account to submit to financial institutions. We submit that this is not because Mr. DiMeglio would never do such a thing for ethical reasons, but instead, it was simply easier to advise Mr. Barton to do so.  Sentencing Mr. Barton to life while sentencing Mr. DiMeglio to five years creates a significant sentencing disparity amongst business partners and co-conspirators.


## IX.
## APPLICATION OF THE 18U.S.C. 3553(a)(7) FACTOR:
## RESTITUTION

Mr. Barton will never be able to repay the financial losses. However, imposition of lifetime supervised release instead of life in prison would provide a small chance that a small amount of money could be repaid over time.

## X.
## THE DOWNWARD DEPARTURE UNDER §2B1.1 SHOULD BE APPLIED

Application Note 19(c) in §2B1.1 states that a downward departure may be warranted in "cases in which the offense level determined under this guideline substantially overstate the seriousness of the offense."

Mr. Barton respectfully requests a downward departure on this ground.

## XI.
## CONCLUSION

In 1996 composer and playwright Jonathan Larson was awarded a posthumous Pulitzer Prize for Drama for his musical update of *La Boheme* entitled "Rent." The closing song of the musical attempts to offer perspective about the untimely death of one of the main characters:

> Five hundred twenty-five thousand six hundred minutes,
> Five hundred twenty-five thousand moments so dear.
> Five hundred twenty-five thousand six hundred minutes,
> How do you measure, measure a year?
>
> In daylights, in sunsets, in midnights, in cups of coffee
> In inches, in miles, in laughter, in strife.
>
> In five hundred twenty-five thousand six hundred minutes
> How do you measure a year in the life?

Every hour in prison is a full sixty minutes; every day is a full twenty-four hours. Given the sentencing ranges considered, Mr. Barton will measure most of these years in inches - and in strife.

He will not attend any of his children's graduations, nor will he send them off to college. He will not teach them how to drive. He will not take pictures of them before

Prom, console them late at night after a bad day at school, or likely attend any of their weddings. Whatever discord was created in the family after the divorce will not be easily remedied while he is in prison. As his children grow older, so will his parents. Hopefully neither will pass away while he is in prison.

These past several years, Mr. Barton chose to measure his life in sports cars, in private jet trips, and in the trappings of what most people erroneously equate with success. This is not how he was raised to live his life. This is not how he lived the majority of his life.

There is a tremendous amount of good in Kurt Barton. He has been blessed with many gifts. He now faces a life debt to hundreds of people. We simply ask that he be allowed to repay it both in and out of the federal penitentiary.


Respectfully submitted,

SUMPTER & GONZÁLEZ, L.L.P.
206 E. 9th Street, Suite 1511
Austin, Texas 78701
Telephone:  (512) 381-9955
Facsimile:   (512) 485-3121


By:      /s/ David M. Gonzalez
         Texas Bar No. 24012711

**CERTIFICATE OF SERVICE**

By my signature below, I do hereby certify that on November 1, 2011, a true and correct copy of the foregoing Defendant's Objections to the Presentence Report was delivered via electronic mail to:

Mark Lane                                         Jennifer S. Freel
Assistant United States Attorney      Assistant United States Attorney
816 Congress, Ste. 1000                   816 Congress, Ste. 1000
Austin, TX 78701                              Austin, TX 78701
(512) 916-5858 Telephone                (512) 916-5858 Telephone
(512) 916-5855 Facsimile                  (512) 916-5855 Facsimile

/s/ David M. Gonzalez
David M. Gonzalez